# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**JIMMY DOUG SHELTON**                                                                              **MOVANT**

**v.**                                                             **No. 1:00CR127-P-D**

**UNITED STATES OF AMERICA**                                        **RESPONDENT**

## MEMORANDUM OPINION

This matter comes before the court on the motion of Jimmy Doug Shelton to vacate, set aside, or correct the sentence imposed under the court's April 17, 2002, judgment. In that judgment, the movant pled guilty to the charges contained in Count 49 of the superseding indictment – submitting false tax returns under 26 U.S.C. § 7206A. The government has responded to the motion, and the movant has replied. The movant submitted an amendment to the petition, and the government objected to the amendment. That objection shall be overruled, and the court shall consider all claims raised by the movant. The matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct Shelton's sentence shall be denied.

### Facts and Procedural Posture

The movant, Jimmy Doug Shelton ("Shelton"), was charged in a fifty-count indictment with various crimes arising out of a bingo operation Shelton ran with others. Shelton and others were taking money from the proceeds of the charity bingo game and transferring it, through various channels, to themselves. Under a conditional plea agreement, Shelton pled guilty to Count 49 of the superseding indictment, filing false tax returns under 26 U.S.C. § 7206A, and the remaining counts were dismissed. Under the plea agreement, Shelton reserved the right to appeal

the search and seizure of evidence from his home, as discussed below.

Shelton was indicted in this case after his estranged wife, Cheryl Shelton ("Cheryl"), searched their marital home, took various papers and effects, and copied papers and records. These items were located inside Shelton's home in Tupelo, Mississippi. Cheryl, who was no longer living in the Movant's home, acted as a paid informant for the government. At the government's request, Cheryl entered Shelton's home in 1997 on May 10, May 22, May 29, July 22, July 31, August 1, August 6, August 7, and August 8, in order to search, photocopy, photograph and remove the papers and records regarding the bingo operation – then to provide those records, photocopies, and photographs of the records, to the government.

The evidence Cheryl Shelton recovered was the foundation of the government's case, and the suppression of this evidence was critical to Jimmy Doug Shelton's defense. His trial counsel filed a motion to suppress the evidence – based on the premise that Cheryl did not have authority to consent to a search of the home – and thus that the evidence the government obtained as a result of Cheryl's activities was the result of an illegal search of the home. Jimmy Doug Shelton's trial and appellate counsel contested the evidence solely on the basis that the *search* of Shelton's home was illegal. Thus, both the district court opinion, and the Fifth Circuit opinion, *U.S. v. Shelton,* 337 F.3d 529 (5th Cir. 2003), discuss only the legality of the *search* in this case.

The district court opinion denying Jimmy Doug Shelton's motion to suppress – and the Fifth Circuit opinion affirming that decision – were based on the finding that Cheryl Shelton had authority to give third party consent to the search of Shelton's home. As Cheryl Shelton had access to the residence – which had been the marital home before her suspicions regarding her husband's infidelity – Jimmy Doug Shelton had no reasonable expectation of privacy of its

contents. As such, Cheryl Shelton could give consent to search the home. This was the only issue raised by Jimmy Doug Shelton's counsel on appeal.

## Jimmy Doug Shelton's Claims Under 28 U.S.C. § 2255

Jimmy Doug Shelton frames his claims in this case in terms of ineffective assistance of counsel. He alleges:

1.  That trial counsel was ineffective for failing to challenge Cheryl Shelton's *seizure* of evidence from his home.

2.  That appellate counsel was ineffective for failing to challenge Cheryl Shelton's *seizure* of evidence from his home.

3.  That appellate counsel was ineffective for conceding facts during oral argument that were not true, namely, that Jimmy Doug Shelton invited Cheryl Shelton to the home to alter charity bingo records.

The movant has also moved to add a fourth claim to the instant motion to vacate, set aside, or correct his sentence, a claim:

> [That his] rights under the Fourth Amendment to be protected against [unreasonable] searches and seizures were violated when the district court and the Court of Appeals found that [his] estranged wife, who had been given limited *access* to movant's house, but nothing more, had the right to search the house, and seize evidence, while acting as a government agent.

This additional claim is merely a restatement of the substantive claim underlying the movant's first two grounds. The government has opposed this amendment, arguing that permitting it would rob the government of its statute of limitations defense. The court finds, however, that the movant has not presented any new claims in this proposed ground for relief. Instead, he simply presents a different twist on the arguments and facts set forth in Grounds One and Two. In any

event, the government has responded, and the court shall consider the new arguments and the government's response in its decision.

**Ineffective Assistance of Counsel**

To establish that counsel provided ineffective assistance, a movant under 28 U.S.C. § 2255 must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Pitts v. Anderson*, 122 F.3d 275 (1997); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The court must presume that counsel's conduct was reasonable; in other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. The court must not analyze counsel's actions with the crystal clarity of hindsight; instead, the court must view counsel's actions using the information reasonably available to counsel at the time of the representation. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). Should the court determine that counsel's performance was deficient, "then [the court] must determine whether there exists a reasonable probability that but for the complained-of error the outcome of the trial or appeal would have been different." 172 F.3d at 275 (quoting *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997)). As discussed below, counsel's actions were reasonable at trial and on direct appeal, and the movant's underlying claims are without merit. As such, Jimmy Doug Shelton's claims that trial and appellate counsel were ineffective must be denied.

**Cheryl's Seizure of Evidence in the Marital Home**

Jimmy Doug Shelton concedes that the issue of the legality of Cheryl's *search* of his home for evidence of his crime has been resolved by the Fifth Circuit in this case. Instead, he

challenges the validity of Cheryl Shelton's *seizure* of evidence from the home. There appears to be no authority directly on point regarding this issue, whether binding or merely persuasive. As such, any rule applied to the facts of this case must be woven from the Fourth Amendment itself and holdings of factually similar cases. Unfortunately, neither Jimmy Doug Shelton nor the government has woven a complete and satisfactory argument in that regard.

### Jimmy Doug Shelton's Faulty Analysis of the Seizure

Jimmy Doug Shelton argues that his trial and appellate counsel were ineffective in failing to challenge Cheryl's *seizure* of the evidence under the Fourth Amendment. He has cobbled together the holdings from several cases to support this argument, and if the cases had meshed better, he might have won the day. Unfortunately for Shelton, the fragments he attempts to assemble into a new rule of law arise out of factual scenarios distinguishable from the case at hand, and, in the end, cannot stand together. He argues that the permanent[1] warrantless seizure of the papers and other evidence from his home violated the Fourth Amendment prohibition against unreasonable seizures, citing *United States v. Paige*, 136 F.3d 1012 (5th Cir. 1998). In addition, he argues that a government's *seizure* of property (meaningful interference with an individual's possessory interest in that property) is subject to Fourth Amendment review, even if no Fourth Amendment search has taken place. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 58 (1992). Examining these rules in a vacuum might lead to the conclusion that Cheryl Shelton's seizure of documents from her former marital home violated the Fourth Amendment, but a closer examination reveals that the *Paige* and *Soldal* cases have little bearing on the facts of this case.

---

[1] The court assumes, without deciding, that at least some of the the seizures of evidence in this case were permanent.

### *Paige* Relied on the Plain View Doctrine and Is Not Applicable to the Present Case

In *Paige*, the defendant hired workers to repair the roof of his home, which had a detached garage twenty to thirty feet away, but within the curtilage of the home. *Paige*, 136 F.3d at 1015. The defendant had told the workers that they should look in the garage "if [they] needed anything." *Id.* The workers accidentally damaged a section of the siding on the defendants house, and one of them looked for extra siding in the garage. *Id.* He did not see any in the garage workroom or the carport area. *Id.* Upon further inspection, however, he noticed an attic opening and jumped, grabbed a rafter, and pulled himself up to see in the attic. *Id.* As he looked for siding material, he saw a scale and what he believed to be "some type of drugs." *Id.* He summoned the other worker, who also looked at the scale and packages. *Id.* The first worker then summoned his father, the owner of the roofing business (and an off-duty Deputy Sheriff) and told him he had "something for him to see." *Id.* His father arrived, retrieved a ladder, and looked at the scale and packages. *Id.* at 1015-1016. He also reached into an open white bag, retrieved green, leafy material, and smelled it. *Id.* at 1016. He recognized the smell of marijuana, told his workers to continue their roofing while he got help, and left the scene. *Id.*

Help came in the form of a narcotics investigator, who arrived, went directly to the garage, and used a ladder to view the packages – all without a warrant. *Id.* He, too, recognized the smell of marijuana, then sought out the defendant, Paige, who by this time had surmised that his garage had been searched. *Id.* at 1016. Paige said, "[Y]ou already know what it is . . . there's fifty pounds of marijuana up there." *Id.* Paige was then detained, received his *Miranda* warnings, and gave consent for the narcotics officer to search the house and other buildings on the property. *Id.* The narcotics officer photographed the packages of marijuana in the garage

-6-

attic, then seized the marijuana and carried it away. *Id.*

The Fifth Circuit found that the seizure of the marijuana by the narcotics officers was reasonable and justified under the plain view doctrine because the search by law enforcement officers extended no further than the one conducted initially by private citizens. *Paige*, 136 F.3d at 1024. When the narcotics officers looked into the garage attic from the same vantage point as the roofing employees, the marijuana was in plain view. *Id.* at 1016.

*Paige* is distinguishable from the present case in several crucial respects. First, the party giving consent to search in *Paige* was a roofer – related to the defendant only through the roofing contract. As such, he was an outsider who was permitted into the detached garage solely because of the contractual relationship with the defendant. Thus, as discussed below, the Fifth Circuit did not discuss the doctrine of assumption of the risk or whether the roofers had actual authority to consent to the seizure of marijuana. Instead, the Fifth Circuit relied upon the plain view doctrine, which is not applicable to the instant case.

In the present case, however, Cheryl Shelton was as closely bound to the defendant as the court can conceive. She was married to him, *and* she was engaged in a complex criminal enterprise with him. Further, she had unfettered access to the home and everything in it. As such, she had actual authority to consent to the seizure of the evidence from the home. In addition, as discussed below, even if the court were to find that she lacked actual authority to consent to seizure of the evidence, the defendant assumed the risk that she might do so even without such authority. Thus, Cheryl Shelton's actual authority to consent to the seizure – and Jimmy Doug Shelton's assumption of the risk that she might do so – rendered the seizure of the evidence reasonable under a Fourth Amendment analysis.

### *Soldal* Involved a Civil Dispute Where No Search Was Conducted

The *Soldal* case is likewise inapplicable. *Soldal* involved a bitter dispute between a trailer park manager and her tenant. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 58 (1992). The manager had tried once, unsuccessfully, to evict the Soldals – and had initiated a second round of eviction proceedings for non-payment of rent. *Id.* Two weeks before the scheduled hearing in the second eviction proceeding, the manager of the trailer park called the local sheriff's department and requested assistance in removing the Soldals' mobile home from the trailer park. *Id.* Once the deputy sheriffs arrived, trailer park employees wrenched the sewage connections free, disconnected the telephone wires, tore off the trailer's canopy and skirting, and hooked the mobile home to a tractor. *Id.* Soldal informed the deputies that the eviction matter was still pending – and that he wished to file a complaint against the trailer park manager and owner for criminal trespass. *Id.* After conferring with the trailer park manager in the office for about thirty minutes – and after consulting a local prosecutor – the deputies told Soldal that the dispute was a private matter between landlord and tenant (a dubious statement considering that the state assisted the landlord only). *Id.* at 58-59. Soldal then watched as his home was dragged by a tractor into the street. *Id.* at 59. Later, the damaged home was towed to another lot. *Id.*

Both the district court and Seventh Circuit Court of Appeals (sitting *en banc*) – using the "reasonable expectation of privacy" analysis – found that the physical removal of the Soldals' home from its lot was *not* a seizure under the Fourth Amendment. *Id*. at 59-60. The Supreme Court, in a unanimous decision, reversed, holding that the seizure implicated the Fourth Amendment because the government (to say the least) had participated in a "meaningful interference with an individual's possessory interests in that property." *Soldal* 506 U.S. at 63

(citing *United States v. Jacobson*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 (1984)). The Court also held, "Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was *reasonable*. That inquiry entails the weighing of *various factors* and is not before us." *Id.* (emphasis added). The Court did not, however, set forth the "various factors" to consider when determining whether a seizure is reasonable. Indeed, it appears that no court has determined the factors to consider in this situation.

*Soldal* has only limited application to the instant case. Just as in *Paige*, the manager (who orchestrated the seizure) was a third-party outsider with only a contractual relationship to the Soldals. In the present case, Cheryl Shelton (who seized the evidence used against the defendant) was married to the defendant and engaged in a criminal enterprise with him. She obviously consented to the seizure, as she herself seized the evidence. The question thus becomes, "Was that seizure reasonable?" The overwhelming majority of cases dealing with Fourth Amendment searches and seizures focus on the propriety of the *search* of the premises – discussing the defendant's expectation of privacy or lack thereof. The court can find no case, however, setting forth a *test* to determine the reasonableness of a seizure in isolation from a search. The *Soldal* case holds only that a seizure under the Fourth Amendment can occur even absent a search; it does not set forth a test for analyzing the *validity* of such a seizure. Thus, Jimmy Doug Shelton's reliance on *Paige* and *Soldal* is misplaced. As discussed below, the court shall examine the totality of the circumstances to determine whether Cheryl Shelton's seizure of items from her former marital residence was reasonable.

**The Government's Faulty Analysis of the Seizure**

The government's argument is likewise flawed and thus cannot prevail as government has mischaracterized Jimmy Doug Shelton's claim. In its response to Shelton's motion, the government restates Shelton's argument thus:

> [Shelton] claims now, in his § 2255 motion, that *the Government's acceptance of the evidence* was an illegal warrantless seizure, and his counsel was deficient in failing to challenge it.

Government's Response to the Motion to Vacate, Set Aside, or Correct Sentence, p. 2 (emphasis added). This restatement of Shelton's claim is not accurate. Shelton does not claim merely that the government's *acceptance* of the evidence was an illegal seizure; instead, he claims that the government's *use of Cheryl Shelton (an agent of the government) to **obtain** the evidence* violated the Fourth Amendment. The government's characterization places the time of the seizure at the point when Cheryl Shelton presented the evidence to other government agents. Thus, the government argues, those other agents could use the plain view doctrine to seize the evidence. Using the correct characterization of Shelton's argument, however, the seizure occurred when Cheryl Shelton, an agent of the government, picked up the evidence *inside the premises – Jimmy Doug Shelton's home.* As the *other* government agents *outside the home* could not see the evidence until Cheryl Shelton had already seized it and delivered it to them, the government's plain view argument cannot prevail. In addition, Cheryl Shelton had to remove the evidence she seized inside the home from locations not plain view. As such, this exception to the warrant requirement does not apply to her seizure. Thus, neither the government nor Jimmy Doug Shelton present argument reflecting the law on this issue.

## Resolution of the Propriety of the Seizure of Evidence

A dilemma left unresolved under the authority cited by the parties is whether a spouse can have sufficient authority to consent to a search of the premises – yet have insufficient authority to consent to the seizure of evidence therefrom. The court concludes that such a situation is *theoretically* possible – but has not arisen under the facts of this case. As discussed below, the court finds that Cheryl Shelton had sufficient authority to seize the evidence in question and provide it to the government without a warrant. In addition, even if the court were to find that Cheryl Shelton did not have sufficient authority to seize the evidence without a warrant, Jimmy Doug Shelton assumed the risk that she would nonetheless do so, and the seizure was thus reasonable.

Jimmy Doug Shelton argues that the warrantless seizure of the papers from his home is presumptively unconstitutional unless it falls within one of the widely recognized exceptions to the warrant requirement, *e.g.*, exigent circumstances[2], consent[3], plain view[4], national security[5], inventory search[6], or inevitable discovery[7]. The exception at issue in this case is consent – Cheryl Shelton's power to give the government permission to search the Jimmy Doug Shelton

---

[2]*Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980).

[3]*Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

[4]*Horton v. California,* 496 U.S. 128, 134, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

[5]*United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972 (1977).

[6]*Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632 (1990).

[7]*Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501 (1984).

home – and permission to seize the evidence used against her husband. A fact complicating the court's analysis of this issue is Cheryl Shelton's decision to move out of the marital home after discovering evidence that her husband had been unfaithful to her. Had Cheryl Shelton remained in the marital home, she would clearly have had complete custody and control of the home and its contents and thus could have given valid consent to search and seize anything in the home and provide it to the government. *Matlock v. United States*, 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (mutual use of property, or joint access or control of it is generally sufficient). In this case, however, Cheryl Shelton had moved out of the marital home and moved in with her sister. She retained a key to the home, as well as the security code, and had agreed with her husband that she would periodically enter the home to retrieve her mail and other items. This arrangement appears to be an effort by each spouse to maintain civility during a turbulent time in their marriage. Both spouses understood that Cheryl Shelton had authority to enter the home outside the presence of Jimmy Doug Shelton. As such, no matter what restrictions she and her husband decided she should observe while there, she had unfettered – and unsupervised – access to everything inside. Cheryl and Jimmy Doug Shelton were still married – and could conceivably have reconciled if they had chosen to do so. Indeed, neither Cheryl nor Jimmy Doug Shelton took any legal steps to divorce. They were also both involved in the illegal bingo skimming operation.

This set of circumstances gave Cheryl Shelton authority to search the home and seize evidence from it – whether she acted as an agent of the government or for her own reasons. In addition, Jimmy Doug Shelton assumed the risk that his wife (who was also his partner in the bingo skimming operation) would turn on him by searching and seizing evidence of their crimes

and turning it over to the government.

### Cheryl Shelton's Authority to Consent to the Seizure of Evidence

The Fourth Amendment to the United States Constitution consists of a single sentence:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. These fifty-four words have created an enormous volume of case law in federal and state courts; however, none of the cases the parties, this court, or the Fifth Circuit have cited are directly on point.

On its face, the Fourth Amendment does not prohibit the government from conducting searches and seizures within one's home. The amendment prohibits only *unreasonable* searches and seizures. The ultimate issue to resolve in this case is whether Cheryl Shelton's seizure of the evidence used to convict her husband was reasonable. The court finds that it was.

The Supreme Court has applied the Fourth Amendment to a seizure in the absence of a search[8] – and held that a seizure may implicate the Fourth Amendment even when a defendant's privacy interests in the seized objects are completely extinguished.[9] However, as a matter of reason, many of the factors used to determine whether a defendant has a reasonable expectation of privacy in a home (to determine the reasonableness of a search) can *also* be used to determine the degree of a third party's connection to a premises (to determine the reasonableness of a

---

[8] *Soldal v. Cook County, Illinois*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450, 61 USLW 4019 (1992).

[9] *Paige v. United States*, 136 F.3d 1012, 1021-22 (5th Cir. 1998).

seizure).  Naturally, the greater the connection a third party has to a premises, the lower the defendant's expectation of privacy becomes – and the more reasonable a search or seizure authorized by that third party appears.  These factors rise and fall together.

Wives and husbands are bound in the closest of relationships – matrimony – and they usually share a residence.  As such, situations under which a wife could *not* consent to a search of the premises – and the seizure of evidence therefrom – will be rare.  The intimate nature of the marital relationship gives either spouse the authority to consent to searches and seizures within the marital home.[10]  Cheryl Shelton chose to move out of the marital home and move in with her sister because Cheryl believed her husband had been unfaithful to her.  Neither party, however, took any legal steps to initiate a divorce, and Jimmy Doug Shelton consented to Cheryl Shelton's unfettered access to the home.  He took *no* steps to hide the evidence of illegal skimming from the charity bingo operation from his wife by removing the evidence from the home or locking it away.

In addition, Cheryl Shelton's decision to move in with her sister in no way limited her access to the marital home; she just chose to live elsewhere in light of the belief that her husband had been unfaithful.  Indeed, under Mississippi law it appears unlikely that Jimmy Doug Shelton could legally have prevented his wife from entering the marital home in the absence of a court order.  First, any property brought into the marriage by one spouse and used by the family becomes a marital asset.  *Johnson v. Johnson,* 650 So.2d 1281, 1286 (Miss.1994).  Such appears

---

[10]An exception to this rule can be found in the United States Supreme Court's holding in *Georgia v. Randolf*, 547 U.S. 103, 126 S.Ct. 1515 (2006).  The *Randolf* court held that one spouse cannot consent to the search of a premises when the other spouse is physically present and objects to the search.  *Randolf* does not apply to the facts of this case, as Jimmy Doug Shelton was not physically present to object to the searches in question.

to be true of the Shelton home in this case, as Cheryl and Jimmy Doug Shelton lived together in the home for six years.  Second, Mississippi does not recognize "legal separation;" as such, Cheryl Shelton's departure from the marital home did not divest her from an equitable interest in it.  *Aron v. Aron*, 832 So.2d 1257 (Miss. App. 2002).  The court thus finds that the residence from which Cheryl Shelton seized and removed evidence was still the martial home at the time of seizure.  Therefore, Cheryl Shelton had actual authority to conduct a search of the home and to give valid consent to seize the evidence.

### Jimmy Doug Shelton's Assumption of the Risk
### That Cheryl Shelton Would Turn on Him

The authorities regarding third party consent to search and seize evidence frequently discuss the doctrine of assumption of the risk.  Some courts apply the doctrine to partners in crime; "'[T]he risk of being . . . betrayed by an informer or deceived as to the identity of one [with] whom one deals is probably inherent in the condition of human society.'  In other words, 'that's life.'"  *United States v. Schuster,* 684 F.2d 744, 748 (11th Cir.1982) (citations omitted), *reh'g granted and opinion adopted,* 717 F.2d 537 (1983) (en banc), *cert. denied,* 465 U.S. 1010, 104 S.Ct. 1008, 79 L.Ed.2d 239 (1984).  Other courts apply the doctrine to defendants who share joint control over a residence with a third party.  *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991).  Unfortunately for Jimmy Doug Shelton, both scenarios apply to this case.  Assumption of the risk is a doctrine seeking to quantify the reasonableness of searches and seizures.  The law recognizes that human beings sometimes breach the duty of fidelity in their dealings with each other.  As such, expecting absolute fidelity from all those with whom we associate is not reasonable.  All people must take this fact of human nature into account when

making decisions every day – weighing the benefit of dealing with someone against the risk that he might cause them harm. Just as a husband may not be faithful to his wife, a criminal may not be faithful to her partner in crime – and may turn him in to law enforcement.

These are examples of a larger view of assumption of the risk, which can be stated thus: The more tightly bound one is to another, the more the two can accomplish together, but the more harm each risks from the other. In recognition of this assumption of risk – and in an effort to promote full and free communication within certain close relationships – some states have created rules that prohibit the compulsion of testimony from people bound in such relationships. *See, e.g.,* MISS. R. EV. 502 (Lawyer-Client Privilege), 503 (Physician-Psychotherapist Privilege), 504 (Husband-Wife Privilege), 505 (Priest-Penitent Privilege). Outside of such privileges, however, people assume the risks reasonably incurred from their close association with others – particularly close criminal association.

Jimmy Doug Shelton and his wife were connected not only by marriage, but by the bonds of criminal enterprise. Indeed, Cheryl Shelton returned to the marital home to alter bingo cards for the skimming operation – and did so *after* moving in with her sister. Under the doctrine of assumption of the risk, it matters little whether this was done at the behest of her husband or another involved in the skimming operation.[11] Either way, the co-participants in the crime assumed the risk that the others might turn them in to the authorities. This additional bond only

---

[11]For this reason, Ground Three of the instant petition – that appellate counsel was ineffective for improperly conceding facts that were untrue – must fail. Whether Jimmy Doug Shelton or someone else had invited Cheryl Shelton into the marital home to participate further in the skimming operation is irrelevant. Cheryl Shelton was part of the criminal enterprise and had been for some time. Jimmy Doug Shelton knew it and encouraged her participation. Thus, he assumed the risk that she might seize evidence from their home and turn him in to the authorities.

strengthens Cheryl Shelton's authority to consent to the seizure of the evidence – and weakens Jimmy Doug Shelton's argument that her seizure of the evidence used against him was unreasonable. The court thus finds that when Jimmy Doug Shelton included his wife in the illegal bingo skimming scheme, he assumed the risk that she might seize evidence from their marital home for use by the government against him.

Jimmy Doug Shelton argues that once Cheryl Shelton became an agent for the government, she could no longer do anything that a government agent could not do, and that the assumption of the risk argument therefore does not apply:

> Under the holdings of *Jenkins* and *Shelton*, anyone who trusts a third party – be that third party an estranged spouse, an employee, a housekeeper, a nanny, or a law clerk, and allows that person access to one's house or office – "assumes the risk" that this person will be recruited by the Government and thereafter used as an agent to conduct warrantless searches and seizures of one's property.

Movant's Supplemental and Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, p. 11.

First, other than "estranged spouse," the third parties used as examples in this parallel do not even approximate the level of intimacy of the marital and criminal relationship between Jimmy Doug Shelton and Cheryl Shelton. Employees, housekeepers, nannies, and law clerks (the strangest example) would not be closely bound to Jimmy Doug Shelton – or to his home. As such, the comparison between these peripherally related third parties and a husband and wife is not meaningful.

Second, this argument is both irrational and impractical. The rule Jimmy Doug Shelton seeks to impose here cannot logically be applied in even the simplest situation. For example, under this proposed rule of law, once Cheryl Shelton became an informant for the government,

she would need a warrant to enter the marital home – because a federal agent would need a warrant to do the same thing. She would likewise need a warrant to enter her husband's office – because a federal agent would need a warrant for that, as well. Had she not moved out of the marital home, she would also need a warrant to turn out her husband's pants pockets while doing laundry – because a federal agent would need a warrant to do so. Such examples of the impracticality in applying this rule are endless.

The proper – and rational – rule is that informants in the position of Cheryl Shelton wear two hats – one as civilians living their lives – the other as government informants collecting evidence. Under the governing Fifth Circuit precedent, "[B]ecoming an 'agent' for the purposes of Fourth Amendment analysis does not terminate one's right to engage in conduct which was authorized prior to entering the agency relationship." *United States v. Jenkins*, 46 F.3d 447 (5th Cir. 1995). Such is the case here. Cheryl Shelton had unfettered access to the marital home and its contents before she became an agent for the government. Her decision to assist the government with its case against her husband did not change that access – or require her to seek a warrant before searching the premises and seizing evidence to be used against her husband.

Criminals assume the risk that their partners in crime – and people with whom they share a residence – may assist law enforcement authorities. This is also known as the "misplaced trust" theory. *Schuster*, 684 F.2d at 748. In this case, prohibiting a wife from collecting evidence of her husband's criminal behavior "goes far beyond making 'every man's house his castle,' and permits [him] to convert his house into 'a den of thieves.'" *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)(internal citations omitted). The court finds that Cheryl Shelton had actual authority to consent to a search of the marital home – and that Jimmy

Doug Shelton assumed the risk that his wife and partner in crime might search the premises, collect evidence, and turn it over to the government. As such, his attorney's decision not to challenge the seizure of the evidence used against him was reasonable. Thus, Jimmy Doug Shelton's claims of ineffective assistance of trial and appellate counsel must fail.

Finally, the movant requested in his supplemental motion under 28 U.S.C. § 2255 that the court set an evidentiary hearing to determine whether the search and seizure carried out by Cheryl Shelton violated the Fourth Amendment. The record, however, contained all the necessary facts for the court to resolve this issue. As such, the request for an evidentiary hearing shall be denied.

In sum, for the reasons set forth above, the instant motion by Jimmy Doug Shelton to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 shall be denied. A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 16th day of November, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE